The undersigned have reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Taylor. The appealing party has not shown good grounds to reconsider the evidence; receive further evidence; rehear the parties or their representatives; or amend the Opinion and Award.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties prior to the hearing in a pre-trial Agreement and at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. All parties are properly before the Commission, and the employment of Plaintiff in this action was and is subject to the jurisdiction of the Industrial Commission of North Carolina pursuant to the Worker's Compensation Act.
2. Perdue Farms, Inc. was and is a qualified self-insured employer under the Act at all times relevant to this claim.
3. Crawford Co., Inc. was and is the servicing agent for Perdue Farms, Inc. at all times relevant to this claim.
4. Plaintiff's average weekly wage was $242.16.
5. The parties stipulated into evidence, as Stipulated Exhibit 1, a packet of plaintiff's medical records.
6. The depositions of Ellen Colodney, M.D., D. Frank Fleming, M.D. and Robert B. Hansen, M.D. are a part of the evidentiary record in this case.
 ***********
The Full Commission adopts the findings of fact found by the Deputy Commissioner as follows:
 FINDINGS OF FACT
1. Plaintiff, at the time of the hearing before the deputy commissioner, was a 45 year-old female with a tenth grade education. She began working as a filleter at Perdue Farms' Lewiston, North Carolina facility in 1979 and worked there for approximately three and a half years. As a filleter, plaintiff would pick up a breast, put it on a table, and fillet it with a knife. She made five cuts per breast and filleted approximately four birds per minute.
2. In 1982, plaintiff was transferred to Perdue Farms' Robersonville, North Carolina facility, where she performed several different jobs including filleting, wing cutting, and pulling tenderloins. Working as a tenderloin puller, plaintiff held a wing, flipped it with her left hand, and made two cuts with her right hand. As a tenderloin puller, plaintiff would average thirty-two (32) birds per minute. In the spring of 1994, plaintiff was working on the line as a wing cutter. The wing cutter position required her to back up an automated machine. When the machine missed cutting a wing, plaintiff would trim the wing with a pair of scissors, making 3 or 4 cuts per wing. The line on which plaintiff worked was located approximately at stomach level while the shackles were at face level. The jobs performed by plaintiff at Perdue Farms were all regular jobs within the plant and were part of the production process.
3. On November 13, 1990, plaintiff went to see Dr. Janet Lewis, complaining of right shoulder and chest pain. On November 29, 1990, Dr. Lewis referred plaintiff to Dr. D. Frank Fleming, a neurologist, for further evaluation. Dr. Fleming examined plaintiff on December 10, 1990, and diagnosed her with right shoulder and arm pain of an uncertain etiology, possibly related to a cervical radiculopathy or carpal tunnel syndrome. Dr. Fleming advised plaintiff to stay out of work for the next ten (10) to fourteen (14) days, while further tests were performed. Dr. Fleming then referred plaintiff to Eastern Carolina Neurological Associates, Inc., where Dr. J. Griffith Steel conducted an electromyography study (EMG) of plaintiff's right arm on December 12, 1990. The EMG was normal, which indicated that plaintiff did not have carpal tunnel syndrome.
4. Plaintiff returned to see Dr. Fleming on December 19, 1990. During this visit, Dr. Fleming reviewed the x-rays that were taken at Roanoke-Chowan Hospital on November 20, 1990, and determined that they showed a small hairline fracture of the dorsal spinous process of C5. Dr. Fleming further determined that there was evidence of traumatic degenerative disease in plaintiff's neck and extended her leave from work until January 10, 1991. Pursuant to Dr. Fleming's referral, plaintiff had an MRI of her cervical spine taken on December 26, 1990, at MRI of Eastern Carolina. The MRI revealed a narrowing on the left side of C5-6 and C6-7 with a mild encroachment on the C6 and C7 proximal nerve roots. On February 20, 1991, Dr. Fleming released plaintiff to return to her regular duties at Perdue Farms and released her from his care.
5. Plaintiff filed a claim with the Industrial Commission, alleging that she suffered from carpal tunnel syndrome in her right hand as of November 27, 1990. Perdue Farms paid plaintiff's medical expenses associated with this claim and paid plaintiff temporary total disability compensation from December 10, 1990 through February 25, 1991, on a Form 21, which mistakenly lists carpal tunnel syndrome as the compensable condition, even though she did not have carpal tunnel syndrome. Perdue Farms never accepted liability for plaintiff's fibromyalgia.
6. On August 26, 1992, Plaintiff returned to see Dr. Fleming, complaining of increased pain in the right side of her neck and across both shoulders. Plaintiff had negative Tinel's and Phalen's in both wrists and was diagnosed with cervical muscle spasm and trapezius muscle strain. Dr. Fleming was doubtful that plaintiff had carpal tunnel syndrome. Plaintiff did not return to see Dr. Fleming until April 15, 1994. At that time, Dr. Fleming was of the opinion that plaintiff's problems were related to a chronic muscle spasm across her shoulder and neck and not active bursitis or carpal tunnel syndrome. On April 15, 1994, plaintiff had no sensory loss in the median versus ulnar distribution of either hand, and her Tinel's and Phalen's maneuvers were negative for discomfort. Dr. Fleming stated that plaintiff's problems seemed about the same as noted three years ago and that at that time she had a cervical MRI, which showed some minor cervical degenerative disk disease with significant root entrapment. Dr. Fleming never diagnosed plaintiff with carpal tunnel syndrome or fibromyalgia syndrome. Dr. Fleming was never able to form a diagnosis with any degree of medical certainty as to what was causing plaintiff's discomfort.
7. On February 15, 1994, plaintiff went to see Dr. Colin D. Jones in Perdue's Medical Department, complaining of pain in her shoulders and trapezius. Dr. Jones prescribed Naprosyn and advised her to continue working full duty. On April 1, 1994, plaintiff consulted Letitia Bennett, the plant nurse, complaining of pain in her shoulders and hands. That same date, plaintiff went to see Richard L. Woodard, PA-C, at Cashie Medical Center for a second opinion. Mr. Woodard wrote plaintiff a note taking her out of work from April 4, 1994 through April 18, 1994, as a result of chronic neck pain. Nurse Bennett informed plaintiff that because she was claiming her problem was work related, Perdue Farms would not honor Mr. Woodard's note to stay out of work since he was not an authorized treating physician. Perdue Farms then scheduled plaintiff appointments with Dr. Jones and Dr. Robert B. Hansen. On April 19, 1994, plaintiff saw Dr. Jones, and was diagnosed with fibromyalgia syndrome.
8. Plaintiff was evaluated by Dr. Hansen, a neurologist with Southeastern Neurology Group, P.C. on April 21, 1994. Dr. Hansen diagnosed plaintiff with myofascial pain syndrome and recommended that she re-engage in physical therapy and other behavioral modalities. Plaintiff was not inclined to repeat physical therapy, as she believed that this aggravated her neck symptoms on a previous occasion. At that time, plaintiff would not consider returning to work with job limitations. Dr. Hansen diagnosed plaintiff with fibromyalgia, but did not diagnose her with de Quervain's tenosynovitis or carpal tunnel syndrome. Dr. Hansen was of the opinion that plaintiff's work at Perdue Farms did not cause her fibromyalgia as he did not think there was any particular factor at Perdue that would have caused the fibromyalgia, and in his opinion, plaintiff would have developed this condition had she worked at any other form of employment. Dr. Hansen was of the opinion that using your muscles would aggravate the symptoms of fibromyalgia, however he was not of the opinion that plaintiff's employment would actually contribute to or add to the disease. Dr. Hansen was of the opinion that any usage of plaintiff's muscles would have aggravated her symptoms but not her condition.
9. Plaintiff requested a medical leave from Perdue Farms, which was to begin on April 4, 1994. On June 16, 1994, Perdue Farms sent plaintiff a letter, informing her that she needed to complete a medical leave of absence sheet from the Wellness Center in order to have her medical leave of absence approved. Plaintiff, however, never completed the appropriate forms nor provided Perdue Farms with a note from her treating physician. Because plaintiff failed to provide any proof of disability, Perdue Farms sent plaintiff a letter on August 1, 1994, terminating her employment with Perdue Farms as of that date. Plaintiff did not seek employment and was not employed in any way after April 1994.
10. On June 20, 1994, plaintiff presented to Dr. Daksha Mehta, a rheumatologist with the East Carolina University Department of Rheumatology. Dr. Mehta found no clinical evidence of radiculopathy or neuropathy, but findings suggestive of fibromyalgia. Dr. Mehta offers no opinion as to the cause of this condition. On November 28, 1994, plaintiff presented to Dr. William Byrd, a rheumatologist, for myofascial pain syndrome, predominantly involving the upper extremity and trunk. Dr. Byrd offers no opinion as to the cause of plaintiff's condition. On June 29, 1995, plaintiff saw Dr. Helen E. Harmon, a rheumatologist with Quadrangle Medical Specialists. Dr. Harmon was of the opinion that plaintiff's myalgias, arthralgias, fatigue, and insomnia were consistent with the diagnosis of fibrositis. Dr. Harmon offers no opinion as to the cause of this condition.
11. On March 21, 1997, plaintiff was seen by Linda Abbott, a certified nurse practitioner with Chowan Medical Center. Ms. Abbott found that plaintiff had chronic muscle spasms and a probable fibromyalgia. Plaintiff followed-up with Ms. Abbott on June 16, 1997 and again on September 30, 1997, when Ms. Abbott referred plaintiff to Dr. Ellen Colodney, a specialist in physical medicine and rehabilitation.
12. Plaintiff first saw Dr. Colodney on October 8, 1997. Dr. Colodney diagnosed plaintiff with fibromyalgia syndrome. Plaintiff continued to see Dr. Colodney through January 26, 1998. Dr. Colodney never diagnosed plaintiff with carpal tunnel syndrome. Dr. Colodney was not of the opinion that plaintiff's position at Perdue Farms caused or significantly contributed to her development of fibromyalgia. Dr. Colodney was of the opinion that plaintiff would have had fibromyalgia regardless of where she worked. Dr. Colodney was further of the opinion that while she believed that plaintiff's employment with Perdue Farms may have aggravated plaintiff's symptoms, however, it did not aggravate plaintiff's disease.
13. Plaintiff's employment with Perdue Farms did not cause, contribute to or significantly aggravate plaintiff's fibromyalgia. Plaintiff's employment did not increase her risk of developing fibromyalgia as compared to the general public. Plaintiff's employment only aggravated plaintiff's fibromyalgia symptoms, not the underlying fibromyalgia. While plaintiff's job was not suitable to one suffering from her underlying fibromyalgia and did indeed cause her to experience more painful symptoms, it did not cause, aggravate or significantly contribute to the disease.
 ***********
Based upon the findings of fact, the Full Commission concludes as follows:
 CONCLUSIONS OF LAW
Plaintiff did not suffer a compensable occupational disease, fibromyalgia, or any other compensable occupational disease, as a result of her employment with Perdue Farms, Inc., as defined by N.C.G.S. §97-53(13).
 ***********
Based on the foregoing findings of fact and conclusions of law, the Full Commission affirms the holding of the Deputy Commissioner and enters the following:
 ORDER
1. Plaintiff's claim under the North Carolina Workers' Compensation Act is hereby DENIED.
2. Each side shall bear its own costs.
3. Defendant shall pay expert witness fees in the amount of $250.00 for Dr. Hansen and $215.00 for Dr. Fleming if they have not already done so.
This the ___ day of ___ 2001.
 S/____________ BUCK LATTIMORE CHAIRMAN
CONCURRING:
 S/______________________ LAURA KRANIFELD MAVRETIC COMMISSIONER
 S/_______________ DIANNE C. SELLERS COMMISSIONER